FILED
United States Court of Appeals
Tenth Circuit

September 1, 2011

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

KANSAS PENN GAMING, LLC,

      Plaintiff-Appellant,

v.

PAT COLLINS, JACK GARNER,
RICHARD HILDEBRAND, CARL
HAYES, and BOARD OF COUNTY
COMMISSIONERS OF THE
COUNTY OF CHEROKEE, KANSAS,

      Defendants-Appellees.

No. 10-3002

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS
(D.C. NO. 2:09-CV-02149-CM-DJW)**

---

Christopher Tayback, Quinn Emanuel Urquhart & Sullivan, LLP, Los Angeles,
California (William D. Beil, Daniel B. Hodes, and Jeremy M. Suhr, Rouse
Hendricks German May PC, Kansas City, Missouri, with him on the briefs), for
Appellant.

Toby Crouse (Wendell F. Cowan, Samuel P. Logan, and James D. Oliver with him
on the brief), Foulston Siefkin LLP, Overland Park, Kansas, for Appellees.

---

Before **TYMKOVICH**, **McKAY**, and **GORSUCH**, Circuit Judges.

---

**TYMKOVICH**, Circuit Judge.

---

This case requires us to consider a class-of-one equal protection lawsuit against a county government based on its demand that a property owner correct a nuisance. Kansas Penn alleges that after it and Cherokee County became involved in litigation concerning a casino development agreement, the County health department targeted Kansas Penn for a regulatory enforcement action. In particular, the County sent Kansas Penn a notice stating that the unkempt condition of its property violated state and local nuisance laws and regulations, and warning that failure to clean up the property would lead to an enforcement action.

Although the County never brought an enforcement action against Kansas Penn, Kansas Penn sued the County and some of its officials under 42 U.S.C. § 1983. In its complaint, Kansas Penn alleged the notice of nuisance violated its right to equal protection by arbitrarily and maliciously singling it out for selective enforcement.

Because we agree with the district court that Kansas Penn has failed to state a claim for relief under the standard set forth by *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) and *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009), we AFFIRM the dismissal of the complaint.

## I. Background

Kansas Penn acquired property in Cherokee County, Kansas with the aim of developing a casino on the site. It applied for the necessary licenses to become a

Lottery Gaming Facility Manager of the planned casino under the Kansas Expanded Lottery Act, KAN. STAT. ANN. § 74-8733, *et seq.* It also entered into a pre-development agreement with the Cherokee County Board of County Commissioners, which apparently included a number of provisions regulating the ultimate casino project.

A year later, Kansas Penn withdrew its Facility Manager application. Cherokee County filed suit in Kansas state court, alleging Kansas Penn had breached the pre-development agreement. The court granted the County's request for an Order of Attachment securing a $25 million bidder's fee that Kansas Penn had deposited in connection with its application. That litigation is still pending.

After Kansas Penn withdrew its application, Cherokee County extended the deadline for Facility Manager applications, but no additional applications were filed. The day after the application deadline passed, Carl Hayes, an enforcement official in the Environmental Section of the Cherokee County Health Department (CCHD), sent a notice letter to Kansas Penn regarding its property. The notice stated Kansas Penn's property appeared "abandoned" and claimed an "onsite investigation" revealed "[s]ix structures in various stages of deterioration;" the remains of "a concrete house foundation;" "solid debris and waste," including "tires, barrels, appliances, concrete," and other items; and "evidence that an indeterminate amount of waste material [had been] disposed of by burning." Aplt. App. at A17 (CCHD notice). The notice went on to assert these conditions

were "visually offensive" and violated five Kansas statutes and a Cherokee County resolution relating to nuisances and abandoned property. *Id.* It directed Kansas Penn to bring the property into compliance within 45 days and to submit documentation regarding the disposal of debris. The notice warned that failure to do so would result in prosecution by the Cherokee County Attorney.

Kansas Penn investigated the allegations in the notice by sending agents to inspect the property. Kansas Penn claims its investigation revealed "no evidence of burning," and, in its opinion, the property's condition did not "amount to a public nuisance or otherwise violate applicable environmental regulations." *Id.* at A11–12 (Compl. ¶ 22). Kansas Penn also alleges other, unnamed Cherokee County properties were in conditions similar to, and in some cases worse than, those on its property.

Seeking more information, Kansas Penn made a document request to the County and CCHD under the Kansas Open Records Act (KORA) regarding the County's enforcement activities. Kansas Penn asserts the County's response showed that: (1) Cherokee County did not receive any citizen's complaint regarding the conditions of Kansas Penn's property; (2) there was no written record of an "onsite investigation" of Kansas Penn's property; (3) since January 2006, the CCHD had sent no other notices to landowners alleging violations of environmental regulations; and (4) no such notices were ever sent to the prior

owners of the Kansas Penn property, though it was in the same condition at the time Kansas Penn acquired it.  Aplt. App. at A9–14 (Compl. ¶¶ 11, 24–30).

Kansas Penn brought this suit in federal court, claiming defendants violated its right to equal protection by treating it differently than other, similarly situated property owners in Cherokee County, without a rational basis for doing so. Kansas Penn asserts defendants sent the CCHD notice in retaliation for its withdrawal of the Facility Manager application and the legal positions it has taken in the breach of contract lawsuit.

In response to defendants' motion, the district court dismissed Kansas Penn's complaint for failure to state a claim.  Kansas Penn appeals that disposition here.

## II.  Discussion

### A.  *Standard of Review for a Motion to Dismiss*

We review de novo the dismissal of a complaint for failure to state a claim. *Teigen v. Renfrow*, 511 F.3d 1072, 1078 (10th Cir. 2007).

The Supreme Court recently clarified the standard for granting a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) in *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) and *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009). Prior to these cases, courts followed the axiom that dismissal is only appropriate where "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."  *Conley v. Gibson*, 355

U.S. 41, 45–46 (1957).  Observing that this language "has been questioned, criticized, and explained away long enough," the Court concluded the *Conley* formulation "has earned its retirement."  *Twombly*, 550 U.S. at 562, 563.

In its place, the Court articulated a new, further refined standard:  to withstand a motion to dismiss, a complaint must have enough allegations of fact, taken as true, "to state a claim to relief that is plausible on its face."  *Id.* at 570.  The Court has explained that two working principles underlie this standard.  First, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions."  *Iqbal*, 129 S. Ct. at 1949.  Thus, mere "labels and conclusions," and "a formulaic recitation of the elements of a cause of action" will not suffice; a plaintiff must offer specific factual allegations to support each claim.  *Twombly*, 550 U.S. at 555.  And second, "only a complaint that states a plausible claim for relief survives a motion to dismiss."  *Iqbal*, 129 S. Ct. at 1950.  In other words, a plaintiff must offer sufficient factual allegations to "raise a right to relief above the speculative level."  *Twombly*, 550 U.S. at 555.  "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  *Iqbal*, 129 S. Ct. at 1950.  Thus, in ruling on a motion to dismiss, a court should disregard all conclusory statements of law and consider whether the remaining specific factual allegations, if assumed to be true, plausibly suggest the defendant is liable.

For example, in *Twombly*, the Supreme Court found the plaintiffs' allegation of parallel conduct between two companies did not plausibly suggest a conspiracy in restraint of trade, because this behavior was as likely to have been the result of legal, unilateral action as the product of illicit collusion. 550 U.S. at 566 ("[T]here is no reason to infer that the companies had agreed among themselves to do what was only natural anyway."). Since the plaintiffs failed to make specific factual allegations plausibly suggesting an agreement between the two companies, the complaint failed to state an antitrust claim.

Similarly, in *Iqbal*, the allegation that the FBI disproportionately detained Arab Muslim men as part of its investigation of the events of September 11, 2001 was "consistent with" the claim of invidious discrimination. *Iqbal*, 129 S. Ct. at 1951. But the allegation did not "plausibly establish" a wrongful purpose, as the disparate impact could equally be explained by a legitimate policy of seeking out individuals with a connection to the known perpetrators, who belonged to an Islamic fundamentalist group. *Id.*

This pleading requirement serves two purposes: "to ensure that a defendant is placed on notice of his or her alleged misconduct sufficient to prepare an appropriate defense," and "to avoid ginning up the costly machinery associated with our civil discovery regime on the basis of 'a largely groundless claim.'"

*Pace v. Swerdlow*, 519 F.3d 1067, 1076 (10th Cir. 2008) (Gorsuch, J., concurring) (quoting *Twombly*, 550 U.S. at 557).

Since these decisions, courts have struggled to apply the new pleading standard consistently. The primary source of confusion has been the meaning of the term "plausibility." According to the Supreme Court, "the plausibility standard ... asks for more than a sheer possibility" of unlawful conduct:

> A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief.

*Iqbal*, 129 S. Ct. at 1949 (quotations omitted).

Applying this standard, we have stated that "plausibility" refers to "the scope of the allegations in a complaint: if they are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs 'have not nudged their claims across the line from conceivable to plausible.'" *Robbins v. Okla. ex rel. Dep't of Human Servs.*, 519 F.3d 1242, 1247 (10th Cir. 2008) (quoting *Twombly*, 550 U.S. at 570).

The nature and specificity of the allegations required to state a plausible claim will vary based on context. *Smith v. United States*, 561 F.3d 1090, 1104

(10th Cir. 2009) (addressing an Eighth Amendment conspiracy); *Gee v. Pacheco*, 627 F.3d 1178, 1185 (10th Cir. 2010) (resolving a prisoner complaint). "The *Twombly* standard may have greater bite" in the context of a § 1983 claim against individual government actors, because "they typically include complex claims against multiple defendants." *Robbins*, 519 F.3d at 1249. "[I]t is particularly important in such circumstances that the complaint make clear exactly *who* is alleged to have done *what* to *whom,* to provide each individual with fair notice as to the basis of the claims against him or her, as distinguished from collective allegations against the state." *Id.* at 1250.

With these pleading standards in mind, we turn to Kansas Penn's complaint of an equal protection claim.

## B. Class-of-One Equal Protection Claim

### 1. Legal Framework

Equal protection jurisprudence has traditionally been concerned with governmental action that disproportionally burdens certain classes of citizens. But Kansas Penn does not allege that it is a member of a particular class. Rather, it seeks to proceed on the "class-of-one" theory set forth by the Supreme Court in *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000). There, the Court recognized the existence of an equal protection claim in a zoning dispute brought by a single plaintiff, "where the plaintiff alleges that she has been intentionally

treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Id.*

"The paradigmatic 'class of one' case, [] sensibly conceived, is one in which a public official, with no conceivable basis for his action other than spite or some other improper motive (improper because unrelated to his public duties), comes down hard on a hapless private citizen." *Lauth v. McCollum*, 424 F.3d 631, 633 (7th Cir. 2005). Successful claims have arisen from unfavorable zoning decisions, *see Olech*, 528 U.S. 562, withholding of permits, *see Gerhart v. Lake County Mont.*, 637 F.3d 1013, 1023 (9th Cir. 2011), and selective regulatory enforcement, *see Mimics, Inc. v. Vill. of Angel Fire*, 394 F.3d 836, 849 (10th Cir. 2005).

Since *Olech*, we have refined the elements for a class-of-one claim. To prevail on this theory, a plaintiff must first establish that others, "similarly situated in every material respect" were treated differently. *Jicarilla Apache Nation v. Rio Arriba County*, 440 F.3d 1202, 1210 (10th Cir. 2006). A plaintiff must then show this difference in treatment was without rational basis, that is, the government action was "irrational and abusive," *id.* at 1211, and "wholly unrelated to any legitimate state activity," *Mimics, Inc.*, 394 F.3d at 849 (quotation omitted). This standard is objective—if there is a reasonable justification for the challenged action, we do not inquire into the government actor's actual motivations. *Jicarilla Apache Nation*, 440 F.3d at 1211.

-10-

We have approached class-of-one claims with caution, wary of "turning even quotidian exercises of government discretion into constitutional causes." *Id.* at 1209. In *Jennings v. City of Stillwater*, 383 F.3d 1199, 1210–11 (10th Cir. 2004), for example, we discussed the risks such a claim could pose to ordinary government decision-making:

> [T]he concept of a class-of-one equal protection claim could effectively provide a federal cause of action for review of almost every executive and administrative decision made by state actors. It is always possible for persons aggrieved by government action to allege, and almost always possible to produce evidence, that they were treated differently from others, with regard to everything from zoning to licensing to speeding to tax evaluation. It would become the task of federal courts and juries, then, to inquire into the grounds for differential treatment and to decide whether those grounds were sufficiently reasonable to satisfy equal protection review. This would constitute the federal courts as general-purpose second-guessers of the reasonableness of broad areas of state and local decisionmaking: a role that is both ill-suited to the federal courts and offensive to state and local autonomy in our federal system.

These concerns are magnified with challenges to low-level government decision-making, which often involves a great deal of discretion. The latitude afforded police officers, IRS agents, university administrators, zoning officials, and other, similar government actors necessarily results in a sizeable amount of random variation in outcome. If even innocuous inconsistencies gave rise to equal protection litigation, government action would be paralyzed.

The Supreme Court's latest pronouncement on class-of-one theory also reflects some of these concerns. In *Engquist v. Or. Dep't. of Agric.*, 553 U.S. 591

-11-

(2008), the Court reconsidered class-of-one liability in the context of public employment. Noting the zoning context of *Olech*, the Court reiterated that "legislative or regulatory classification" must be applied equally and "without respect to persons." *Id.* at 602 (quotation omitted). In other words, to avoid "the specter of arbitrary classification . . . a rational basis for the difference of treatment" is necessary "when it appears that an individual is being singled out by the government." *Id.* The Court found it significant that *Olech* rested on the existence of a clear and easily administrable standard: the government was not "exercising discretionary authority." *Id.* But a decision in the employment context is "subjective and individualized, resting on a wide array of factors that are difficult to articulate and quantify." *Id.* at 604. Based on this distinction, the Court concluded the class-of-one theory of equal protection is a "poor fit" in the public employment context.[1] *Id.* at 605 (finding the class-of-one theory as

---

[1] Cherokee County suggests that *Engquist* established a per se rule that *any* discretionary decision is immune from class-of-one liability. But we need not consider the outer reaches of the opinion here, since Kansas Penn's claim fails under our existing case law. We note, however, that several circuits have read *Engquist* to apply more broadly than the employment context. *See, e.g.*, *United States v. Moore*, 543 F.3d 891, 898–99 (7th Cir. 2008) ("[A] class-of-one equal protection challenge . . . is just as much a 'poor fit' in the prosecutorial discretion context as in the public employment context" because "there is no readily apparent standard against which departures can be assessed for arbitrariness."); *Flowers v. City of Minneapolis*, 558 F.3d 794, 799–800 (8th Cir. 2009) ("In light of *Engquist,* therefore, we conclude that while a police officer's investigative decisions remain subject to traditional class-based equal protection analysis, they may not be attacked in a class-of-one equal protection claim."). *But see Hanes v. Zurick*, 578 F.3d 491, 494–95 (7th Cir. 2009) (declining to extend *Engquist* to

(continued...)

applied to the public employment context does not implicate the "core concern[s] of the Equal Protection Clause," and therefore that the "claimed right can more readily give way to the requirements of the government as employer").

Relying in part on these concerns, we have recognized a "substantial burden" that plaintiffs demonstrate others "similarly situated in all material respects" were treated differently and that there is no objectively reasonable basis for the defendant's action. *Jicarilla Apache Nation*, 440 F.3d at 1212 ("The requirement that a plaintiff show that similarly situated persons were treated differently is especially important in class-of-one cases." (quotation omitted)); *see also Jennings*, 383 F.3d at 1214 ("It is [] imperative for the class-of-one plaintiff to provide a specific and detailed account of the nature of the preferred treatment of the favored class").[2]

---

[1](...continued)
class-of-one claims against police investigators).

[2] Cherokee County argues that *Jennings* further cabined the class-of-one claim by establishing a "material effects" test. We disagree. *Jennings* involved a dismissal on grounds of standing. 383 F.3d at 1199. There, we found the asserted injury—the state's decision not to prosecute the plaintiff's case—was not the result of the defendant police officer's influence, but instead of the District Attorney's independent decision not to proceed. *Id.* at 1213–15 ("Ultimately the decision not to prosecute was made by District Attorney Hudson, and Plaintiff does not contend that Hudson's actions were discriminatory or wholly arbitrary."). In other words, we did not find the plaintiff's alleged injury was inadequate; we held only that the injury was not fairly traceable to the defendant.

-13-

This understanding is consistent with the practice of other circuits. *See*, *e.g.*, *Analytical Diagnostic Labs, Inc. v. Kusel*, 626 F.3d 135, 143 (2d Cir. 2010) ("[P]laintiff [must] show that no rational person could regard the circumstances of the plaintiff to differ from those of a comparator to a degree that would justify the differential treatment on the basis of a legitimate government policy." (quotation omitted)); *Cordi-Allen v. Conlon*, 494 F.3d 245, 251 (1st Cir. 2007) ("This requirement demands more than lip service. It is meant to be a very significant burden." (quotation omitted)); *Purze v. Village of Winthrop Harbor*, 286 F.3d 452, 455 (7th Cir. 2002) (requiring a class-of-one plaintiff to demonstrate that the comparable properties were "*prima facie* identical in all relevant respects").

We emphasize our strict reading of this element because it addresses the main concern with the class-of-one theory—that it will create a flood of claims in that area of government action where discretion is high and variation is common. This is because the requirement that comparators be "similarly situated in *all material respects*" is inevitably more demanding where a difference in treatment could legitimately be based on a number of different factors. A broader application "could subject nearly all state regulatory decisions to constitutional review in federal court and deny state regulators the critical discretion they need to effectively perform their duties." *Lieb v. Hillsborough County Pub. Transp. Comm'n*, 558 F.3d 1301, 1307 (11th Cir. 2009) (quotation and citation omitted).

-14-

In cases not involving judgments that are "subjective and individualized," the plaintiff will meet this burden easily. For example, in *Olech*, the defendant village appeared to have a long-held policy of requiring a 15-foot easement of *all* property owners who requested access to the municipal water supply, regardless of difference in cost or circumstance. 528 U.S. at 563. Accordingly, when the village demanded that the Olechs alone agree to a 33-foot easement, without suggesting any proper reason for the deviation, it was likely that the village was motivated by improper political animus.

But where the government actor enjoys a broader range of discretion, and may properly base a decision on a myriad of potentially relevant variables, it is more likely that there are "material distinctions between allegedly similarly situated parties," leading to "a ready supply of rational and not wholly arbitrary reasons for differential treatment." *Jicarilla Apache Nation*, 440 F.3d at 1213. In these cases, the plaintiff must account for a wide range of characteristics in identifying similarly situated individuals. *See, e.g.*, *id.* (noting the difficulty of making this showing in the context of property value assessment for tax purposes, as each property has unique characteristics); *Lieb*, 558 F.3d at 1307 (noting the challenged zoning decision involved "the discretionary application of a variegated set of factors" such as "aesthetic considerations, [and] comparison with industry standards").

In the past, this burden has not presented a significant challenge in the pleading stage. In *Olech*, the Supreme Court found the plaintiffs' complaint successfully stated a class-of-one claim merely by asserting generally that all other property owners had been asked to provide a 15-foot easement rather than a 33-foot easement. 528 U.S. at 565. Taking their cue from *Olech*, some courts initially required nothing more than the threadbare allegation of different treatment to similarly situated individuals to defeat a motion to dismiss. *See, e.g.*, *DeMuria v. Hawkes*, 328 F.3d 704 (2d Cir. 2003) (finding the plaintiffs' assertion that they received a different standard of police protection than typically given to town residents was sufficient, "albeit barely").

But in the wake of *Twombly* and *Iqbal*, and consistent with our cases establishing a more refined analytical framework for class-of-one claims, we must apply the plausibility standard with care. As at least one circuit has found, in light of *Iqbal*, a generalized pleading in the mold of *Olech* is no longer sufficient to state a class-of-one claim. *Ruston v. Town Bd. for Town of Skaneateles*, 610 F.3d 55 (2d Cir. 2010), *cert. denied*, 131 S. Ct. 824 (2010). In that case, for example, the Second Circuit upheld the dismissal of plaintiffs' claim against the defendant town, for failure to set out specific examples of similarly situated individuals and differing treatment. *Id.* at 59. We likewise dismissed a class-of-one claim on similar grounds in an unpublished but representative opinion. *See* *Glover v. Mabrey*, 384 F. App'x 763, 778 (10th Cir. 2010) ("[Plaintiff] has failed

-16-

to allege, as it must, the identity or characteristics of other, similarly situated contractors and how those similarly situated contractors were treated differently.").[3]

With these principles in mind, and consistent with our holdings in *Robbins*, 519 F.3d at 1247, 1253 and *Smith*, 561 F.3d at 1098, plaintiffs must offer enough specific factual allegations to "nudge[] their claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570.

### 2. Kansas Penn's Complaint

Kansas Penn has not satisfied its pleading burden in this case, for several reasons.

#### a. General Allegations

As an initial matter, Kansas Penn alleges the conditions on its property did not "amount to a public nuisance or otherwise violate applicable environmental laws or regulations." Aplt. App. at A11–12 (Compl. ¶ 22). This allegation is not

---

[3] The Eleventh Circuit has also adopted the requirement that class-of-one plaintiffs specifically plead facts supporting a finding that similarly situated individuals were treated differently. *Griffin Industries, Inc. v. Irvin*, 496 F.3d 1189, 1202–08 (11th Cir. 2007). Although this rule did not originate with *Twombly*, but rather with now-superceded circuit precedent holding that § 1983 claims are subject to a heightened pleading requirement, the Eleventh Circuit still observes this standard for class-of-one claims. *See, e.g.*, *Leib v. Hillsborough County Public Transp. Comm'n*, 558 F.3d 1301, 1307 (11th Cir. 2009) (finding the complaint was sufficiently detailed, but that the detail demonstrated the third parties were not similarly situated, and dismissing the complaint).

supported by factual content, and is merely a conclusion of law.  Under *Twombly* and *Iqbal*, this is insufficient, and not entitled to a presumption of truth**.**

The only specific factual allegation Kansas Penn offers in the face of the CCHD's nuisance notice—which itself provides significant detail—is the assertion that the property did not exhibit "evidence of burning."  Aplt. App. at A11 (Compl. ¶ 22).  While we take that as true at this stage in the proceedings, Kansas Penn ignores the specific other problems with the condition of the property— deteriorated buildings, the remains of a house foundation, and the presence of solid debris and waste.

If Kansas Penn had provided factual allegations suggesting its property was not in violation of the relevant regulations, it could be considered obvious that CCHD treated it differently than other, similarly situated property owners.  We take for granted that there are many properties in Cherokee County that are compliant with nuisance regulations, and also that CCHD has not sent notices to each of them.  But because this theory of the case rests entirely on a legal conclusion about the condition of the property, we must look elsewhere for specific factual allegations showing that Kansas Penn was treated differently than other, similarly situated property owners.  This we cannot find.

First, Kansas Penn contends the CCHD "has not sought to enforce the environmental laws cited in the [CCHD] Letter to [Kansas Penn] against any landowner or tenant in possession of real property in Cherokee County other than

[Kansas Penn] since, at the latest, January 1, 2006." *Id.* at A14 (Compl. ¶ 33). In other words, Kansas Penn asserts that during this three-year period only it received a nuisance notice from the CCHD.

This may suggest Kansas Penn has received different treatment than other property owners in Cherokee County. But the fact that government action is infrequent, or that a formerly unenforced regulation is enforced, is not enough to create a federal cause of action. *Olech* requires more. Kansas Penn must also allege that some number of the property owners receiving different treatment were also similarly situated, thereby indicating that the enforcement action was arbitrary or for an improper motive.

But Kansas Penn offers only *conclusory* allegations that other property owners are similarly situated. The complaint alleges that "numerous parcels of land in Cherokee County exist in conditions comparable to the Subject Property or exhibit conditions similar to and in many cases much worse than those alleged by the [CCHD] to exist on the Subject Property." *Id.* (Compl. ¶ 35). Again, this broad allegation is merely a "formulaic recitation" of a legal conclusion, and is inadequate to show that other properties with ramshackle buildings and visible debris have somehow gotten a pass from CCHD officials. As we discussed above, after *Twombly* and *Iqbal*, it is insufficient to simply allege that other, unidentified properties have "comparable" or "similar" conditions—the claim must be

supported by specific facts plausibly suggesting the conditions on the properties and the properties themselves are similar in all material respects.

These cursory allegations are inadequate to support any class-of-one claim. But they are particularly problematic here, where the complaint addresses the inherently subjective and individualized enforcement of health and safety regulations. Unlike *Olech*, this is not a case where the regulatory decision is a simple, one-dimensional inquiry, resolved with a tape measure. Rather, Kansas Penn challenges an act of regulatory enforcement that implicates a "multiplicity of relevant (nondiscriminatory) variables," "from the relative culpability of the defendants to the optimal deployment of prosecutorial resources," making it "correspondingly more difficult to bring an equal protection claim." *Jennings*, 383 F.3d at 1214–15.

Because Kansas Penn has failed to allege facts suggesting that other property owners were similarly situated in all material respects, the district court did not err in dismissing the complaint.

### b. Allegations Against the County Commissioners and the County

Another aspect of the complaint is infirm as well. In addition to suing Hayes, the CCHD official who sent the notice at issue, Kansas Penn has named the members of the Cherokee County Board of County Commissioners in their individual and official capacities and the Cherokee County Board itself as

defendants.  But Kansas Penn has not sufficiently alleged liability for the individual commissioners and the County.

"In order for liability to arise under § 1983, a defendant's direct personal responsibility for the claimed deprivation of a constitutional right must be established."  *Trujillo v. Williams*, 465 F.3d 1210, 1227 (10th Cir. 2006).  Thus, "when a plaintiff sues an official under . . . § 1983 for conduct arising from his or her superintendent responsibilities, the plaintiff must plausibly plead and eventually prove not only that the official's subordinates violated the Constitution, but that the official by virtue of his own conduct and state of mind did so as well."  *Dodds v. Richardson*, 614 F.3d 1185, 1198 (10th Cir. 2010) (quotation omitted); *see also Iqbal*, 129 S. Ct. at 1949 ("In a § 1983 suit or a *Bivens* action—where masters do not answer for the torts of their servants— . . . . each Government official, his or her title notwithstanding, is only liable for his or her own misconduct.").

Kansas Penn argues the following allegations show personal participation by the individual commissioners in the alleged violation:  (1) that the Board voted to ratify Cherokee County's breach of contract suit against Kansas Penn; (2) that the attorney representing the County in the breach of contract suit also assisted in preparing the County's response to Kansas Penn's KORA request; (3) that Kansas Penn's property existed in the same conditions for years, but only prompted a response from CCHD after Kansas Penn withdrew its application to develop a

casino and no other bidders emerged; and (4) that the individual commissioners and Hayes acted in concert in sending the CCHD notice.

The first three of these allegations are plainly inadequate to establish the commissioners were personally involved in sending the CCHD notice. The fact that the commissioners might have felt animosity towards Kansas Penn, due to its withdrawal of the Facility Manager application and the subsequent breach of contract lawsuit, does not connect them to the nuisance notice. Nor does the fact that the County used the same attorney representing it against Kansas Penn in the contract suit to respond to Kansas Penn's KORA demands. These allegations are speculative, proposing that because the nuisance notice was sent *after* the County sued Kansas Penn, the notice was *because* of the lawsuit—and concomitantly, because the individual commissioners are involved in the lawsuit, they were involved in sending the letter. Such *post hoc ergo prompter hoc* logic does not create a conspiracy.

Only the last contention, that the commissioners actually acted in concert with Hayes in sending the notice, is even relevant to this point. But this allegation is precisely the sort of "naked assertion[] devoid of further factual enhancement" that *Iqbal* instructs us to disregard. 129 S. Ct. at 1949. Though Kansas Penn provides detail suggesting that Hayes sent the notice (including an attached copy of the notice with his signature), it offers nothing to support the

-22-

notion that the commissioners were involved.  Kansas Penn does not even allege that Hayes reports to the commissioners, or that they had any professional contact whatsoever.

Kansas Penn must show *some* active involvement by the Board in Hayes's enforcement action to link them to the deprivation of a constitutional right.  Thus, even if Kansas Penn could show that Hayes acted arbitrarily, we see no basis for linking that act to the commissioners.

As a final matter, under § 1983, a municipality is liable for the unconstitutional acts of its employees only where the action was authorized by official municipal policy.  *Milligan-Hitt v. Bd. of Trs. of Sheridan County Sch. Dist. No. 2*, 523 F.3d 1219, 1223 (10th Cir. 2008).  Official policy may take the form of "formal rules or understandings" or, alternatively, a decision by a municipal officer who is "responsible for establishing final policy with respect to the subject matter in question." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480, 483 (1986).

Because Kansas Penn does not allege the CCHD notice was the product of a formal policy, the success of its claim against Cherokee County rests on whether the notice was authorized by a final policymaker.  The individual commissioners likely qualify as final policymakers—such positions are commonly granted authority to make discretionary decisions that are not reviewable or constrained

-23-

by the decisions of others. *See Milligan-Hitt*, 523 F.3d at 1228. But Kansas Penn has failed to state a claim against these defendants, and it does not even attempt to argue that Hayes, an employee in the CCHD, is a final policymaker.

We therefore conclude the claim against Cherokee County must fail as well.

### III. Conclusion

Because Kansas Penn has failed to state a class-of-one equal protection claim under the standard announced in *Twombly* and *Iqbal*, we AFFIRM the district court's dismissal of this complaint.